# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

RODNEY COOPER,

|  |  |  |
|---|---|---|
| | Plaintiff, | DECISION & ORDER |
| -vs- | | 09-CV-6081CJS |

COUNTY OF MONROE *et al.*,

Defendants.

_____

## APPEARANCES

For plaintiff:                      Christina A. Agola[1]
WNY Civil Rights, LLC
1415 Monroe Avenue
Brighton, NY 14618

For defendants:                 James M. Skelly, Esq.
Marks, O'Neill, O'Brien, Doherty
and Kelly, P.C.
708 Third Avenue,  Suite 2500
New York, NY 10017

_____

[1] On September 10, 2013, the New York State Supreme Court, Appellate Division, Fourth Department, entered an order of suspension pursuant to 22 N.Y.C. R.R. 1022.20. *In re Agola,* 109 A.D.3d 1216 (N.Y. App. Div. 4th Dep't Sept. 10, 2013). Her associate, Ryan Charles Woodworth, has left the firm, and did not take this case with him. No new counsel has entered an appearance in the case. Plaintiff Rodney Cooper contacted the Court by telephone and stated that he was attempting to obtain replacement counsel, but to date, has not done so. The Court informed him that Ms. Agola's office had filed a response to the motion, and that Defendants had filed a reply, therefore, the motion was ripe for decision. The Court also had an inquiry from a local attorney interested in the status of the motion and indicated he wanted to be informed of the outcome, but did not represent Mr. Cooper at this time. Even if new counsel were to make an appearance, the Court's decision on the pending motion would still be based on the papers filed to date. Therefore, the Court will not delay issuing a decision on the possibility that Plaintiff will secure new counsel. Because the Court in this decision does not entirely dismiss the action, it will allow Plaintiff a reasonable time to obtain new counsel before taking further steps toward moving this case to trial.

**INTRODUCTION**

**Siragusa, J.** Plaintiff Rodney Cooper ("Plaintiff"), a former pretrial detainee at the Monroe County Jail ("the Jail"), commenced this action against the County of Monroe, Monroe County Sheriff's Department, Sheriff Patrick O'Flynn ("the Sheriff"), and various members of the Monroe County Sheriff's Department, pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights under the Fourteenth Amendment arising out of his medical care while he was held at the Jail on July 12, 2007.

Plaintiff's amended complaint advances claims against the Sheriff, in his individual capacity, and the County of Monroe. *See* Amended Complaint ("Am. Compl."), ECF No. 47. The third-party defendants in this action, Nurse Deborah Watts ("Watts" or "Nurse Watts"), Correctional Medical Services, and Corizon, Inc., have been terminated pursuant to a stipulation of dismissal entered on September 5, 2012. ECF No. 53. Accordingly, the claims remaining on this motion for summary judgment are limited to the alleged constitutional violations on the part of the County of Monroe and the Sheriff.

Defendants now move for summary judgment seeking dismissal of Plaintiff's amended complaint on the grounds that: (1) Plaintiff failed to demonstrate that an official policy, custom, or practice led to a violation of Plaintiff's constitutional rights; (2) Plaintiff does not establish a constitutional deprivation regarding his medical care at the Jail; and (3) Plaintiff fails to state a cause of action against the Sheriff in his individual capacity for failure to train and supervise. Def. Mem., ECF No. 58-1, at 4-14. Plaintiff has opposed the motion, submitting a response to Defendants' statement of undisputed facts, an attorney declaration with exhibits, and a memorandum of law. ECF No. 64.

For the reasons that follow, the Defendants' motion is granted in part, and denied in part.

**BACKGROUND**

The following facts are undisputed, unless otherwise noted, and viewed in the light most favorable to Plaintiff. Plaintiff was a pretrial detainee who was arrested and detained at the Jail on July 12, 2007. The County of Monroe is a municipal corporation organized and existing by, through and under the laws of the State of New York. Patrick O'Flynn is the elected Sheriff of Monroe County and is in charge of the operation and administration of the Monroe County Sheriff's Department. The Undersheriff supervises the bureau chiefs for each department at the Monroe County Sheriff's Department, including the police bureau, jail bureau, staff services, civil bureau, and court security, and reports directly to the Sheriff.

During the relevant time period, Monroe County had a contract with a private medical services provider, Correctional Medical Services, Inc. ("CMS"), which involved medical services and care to detainees and inmates at the Jail. CMS staff members were trained through their employment with CMS and professional licensure, and no medical training was supervised or performed by the Monroe County Sheriff's Office. Watts Dep. 68:18–69:23 (attached as Ex. E to Defendants' motion papers, ECF No. 58-8). Complaints regarding medical treatment of inmates would be handled by the jail bureau, and, if serious issues arose that affected the entire inmate population or if an inmate died at the facility, the Sheriff would be advised. Harling Aff. ¶¶ 6–7 (attached as Ex. T to Defendants' motion papers, ECF No. 58-23). "It was in the sound discretion of

CMS to evaluate pre-trial detainees, and determine the appropriate medical care of inmates." Harling Decl. ¶ 25.

Plaintiff was arrested by Rochester Police on July 12, 2007, and charged with harassment. He was handcuffed and taken to the Jail, where he was booked and placed in a holding cell. While he was at the Jail awaiting arraignment, Plaintiff was briefly released from his cell to make a telephone call. In the booking area, Plaintiff was involved in an altercation with another inmate, Bruce Miles, who struck Plaintiff in the face and caused him to fall to the ground. Deputies at the Jail immediately assisted Plaintiff, bringing him to the nurses' station for evaluation and treatment.

On the evening of the incident, Nurse Watts was the CMS employee assigned to the booking area. Watts routinely worked the evening shift in the booking department of the Jail between 2004 and 2008, and was working the night of July 12, 2007. Her duties included taking initial medical evaluations of arraigned inmates, performing emergency medical treatment and evaluations of arraigned and un-arraigned inmates, and responding to emergencies. The form she used for screening was provided by her employer, not the jail. Watts Dep. 31:13–23.

After evaluating Plaintiff's injuries, Watts filled out an Inmate Treatment Form. She reported that Plaintiff complained of headache and dizziness, had bleeding from the gums, and had a swollen "goose egg" on his left temple. Watts gave Plaintiff Tylenol® and ice for his face. Watts Dep. 35:12–21. Plaintiff, however, testified that Watts further determined that he suffered from a broken jaw. Pl. Vol. 1, Ex. A (Cooper 50-H Tr.), ECF No. 64-4, at 21. Watts testified that Plaintiff did not require transport to the

hospital, as the severity of his injuries did not require it. Watts Dep. at 36, 77–78.

Watts had passed an examination to become a licensed practical nurse in around 1988. *Id.* at 7:22–23. Watts was licensed by the State of New York in 1990 as a Registered Nurse and possesses an associate's degree in nursing from the Erie Community College in Buffalo, New York. Watts Dep. 6:6–10. She worked for CMS for two years at the Monroe County Jail. *Id.* 9:2–8. Previously, from 2004 until 2008, she worked at the jail for Correctional Medical Care. *Id.* 9:15–20. Prior to 2004, Watts was a Registered Nurse at Rochester General Hospital. *Id.* 10:5–12. In 2002 or 2003, she worked for Unity Health in Rochester for about a year as a Registered Nurse. *Id.* 10:16–11:1. Before that, she worked at the former Genesee Hospital in Rochester for about three years, also as a Registered Nurse. *Id.* 11:2–12.

With respect to the issue of hospital transport, Watts testified that if an un-arraigned inmate needed further medical attention, she would inform the Jail deputies, who would then call the City of Rochester for a transporter to the hospital. Watts routinely called for transport while working at the Jail, and, in the event an inmate needed emergency medical treatment, she was able to obtain transportation for that inmate. Watts Dep. at 50–51, 59–60. Plaintiff disputes this, since he claims he requested emergency care and was not provided transportation to the hospital. Cooper Decl., ECF No. 64-3, ¶ 6; Cooper 50-H Tr. at 21, 47.

Pursuant to the policies and procedures at the Jail, if an un-arraigned inmate needed emergency medical care, an agreement was in place with the City of Rochester whereby the Rochester Police would be responsible for transporting an injured inmate

to the hospital. In practice, medical staff would notify a deputy, who would contact the Rochester Police to return to the Jail to transport the inmate. Watts, as the nurse who evaluated Plaintiff at the time of his incident, was the only medical professional who determined whether Plaintiff required further treatment. Watts Dep. 59:23–60:6; 77:20–78:9. Watts was asked at her deposition whether she would note whether an inmate was asking for further medical treatment, and she responded that she would not. When asked why, she responded, "[b]ecause they all asked." *Id*. 63:21–24. Watts also stated that she would only send an inmate for additional treatment if she thought he needed it. *Id*. 64:10–11. Watts further testified that typically the jail had two nurses on duty during the night shift throughout her tenure at the Monroe County Jail. Watts Dep. 17:6–14. She also stated that she had no independent recollection of treating Plaintiff. Watts Dep. 42:24–43:1.

The day after the incident, Plaintiff was arraigned and subsequently released. Upon his release, Plaintiff sought treatment at Highland Hospital where it was determined that Plaintiff had a fractured jaw.

### Additional Facts[2]

Plaintiff has also provided additional facts pursuant to Local Rule 56(a)(2) for the Court's consideration. The asserted facts that are not supported by the source cited

---

[2] Defendants point out that much of the evidence Plaintiff submits in support of his opposition to Defendants' summary judgment motion consists of unsworn declarations. Rule 56 of the Federal Rules of Civil Procedure permits courts to consider assertions in an unsworn declaration or statement at the summary judgment stage, but only if the declarant affirms, under the penalty of perjury, that the contents of the unsworn statement are true. *See* Fed. R. Civ. P. 56(c) & advisory committee's note (citing 28 U.S.C. § 1746). Here, the witness' unsworn statements attest to the truthfulness of the assertions contained therein, subject to the penalty of perjury, and are thus admissible evidence for purposes of this motion for summary judgment.

have been disregarded. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.").

In July, 2007, the Jail's policies and procedures required that the medical history of pretrial detainees be noted in the detainee's booking sheet, and that all pretrial de-tainees have a medical examination prior to arraignment. Watts Dep. at 70. If an inmate or detainee had a seizure while in custody, Jail policies in July 2007 mandated that the incident be classified as an emergency requiring immediate medical attention. *Id.* at 49.

CMS, Undersheriff Daniel Greene ("Greene"), and the Sheriff met on a routine basis to discuss the policies and procedures regarding medical treatment. Pl. Ex. Vol. 1, Ex. D (Greene Dep.), ECF No.64-5, at 44. In July, 2007, it was policy for the jail bureau and/or the internal affairs department to conduct investigations into medical complaints or issues and, at the conclusion of those investigations, verbal and written recommen-dations would be presented to the Sheriff for review and advisement on the bu-reau/department's findings. The bureau of staff services would conduct follow-ups to those investigations. *Id.* at 30.

In May, 2007, Orlando Samuels ("Samuels"), an inmate with a pre-existing heart condition, died while in the Jail's custody after suffering a heart attack. Sometime follow-ing Samuels' death, the Jail began implementing changes to the policy regarding medi-cal screening of pretrial detainees. Watts Dep. 67.

Both Watts and Greene testified that there were nursing shortages at the Jail, that nurses worked 12-hour shifts, and that it was difficult for the nurses to keep pace

with the medical needs of the Jail. Watts Dep. 70; Pl. Vol. 2, Ex. B (Greene Decl.), ECF No. 64-6, ¶14. However, Watts clarified when examined by Plaintiff's counsel that, "[t]here were shortages in the upstairs, the rest of the jail," not in booking where she primarily worked. Watts Dep. 70:19–71:8. She stated further that it was not until "they upped what we had to do" that they "could have used more nurses because it was taking longer to see the [sic] interview to [sic] people." Watts Dep. 71:10–13. She also related that when the rest of the jail was short on nurses, she would be called out of booking, thereby slowing down the flow of inmates into booking.

On or around May 5, 2007, the Sheriff and Greene met with CMS to discuss the ongoing problem with their medical services. According to Greene, steps were being taken during that time to replace CMS as the Jail's medical services provider. Greene Decl. ¶¶3-7; Greene Dep. at 58–59. Between May 5, 2007, and July 12, 2007, the Sheriff and Lieutenant Samuel Farina ("Farina"), an investigator with the internal affairs bureau of the Jail, jointly met with others in the executive staff to discuss the Samuels incident. Farina states that no action was taken during that time to address the staffing shortages, despite that the issues had been brought to the Sheriff's attention multiple times. Pl. Ex. Vol. 2, Ex. C (Farina Decl.), ECF No. 64-6, ¶ 13. Greene testified that he and the Sheriff "constantly" complained to CMS about the nursing shortages and other problems. According to Greene, CMS indicated that it would address the issues, but never did. Greene Dep. at 58, 69.

Both Greene and Farina had personal knowledge of the conditions of the Jail as they existed during the time period of the allegations set forth by Plaintiff, and Farina

had first-hand knowledge of the staffing shortages of CMS during the relevant time peri-od.[3] Farina Decl. ¶ 5; Greene Decl. ¶2; Greene Dep. at 55. Prior to May 5, 2007, on several occasions, Farina was "asked to provide information about CMS," pertaining to inadequate medical care, financial issues in connection with inmate transport, and the reluctance of medical staff to provide transportation to ill detainees. Farina Decl. ¶ 7. Sometime after May 5, 2007, the Sheriff and Farina, along with others from the execu-tive command staff, met with the New York State Commission on Corrections to discuss Samuels' death. Plaintiff relies on a declaration by Samuel Farina that, "[t]he Commis-sion had significant issues with CMS, specifically, the way they were staffed, and the fact that patients were not being properly evaluated at the time of booking." Farina Decl. ¶ 9. The difficulty with this information, however, is that it is hearsay. Plaintiff does not provide the contents of the Commission's report in an admissible form. Pl.'s Mem. of Law at 5–6. According to Farina, rather than attempt to remedy the problems with CMS, the Sheriff "balked" at the Commission's findings. Farina Decl. ¶¶ 8-10. Farina's decla-ration does not, though, specify the findings the Sheriff found objectionable.

According to Plaintiff, at the time of his booking at the Jail, he did not undergo any medical screening and no medical questions were asked of him. Cooper Decl. ¶ 2; Cooper 50-H Tr. at 16; Pl. Vol. 1, Ex. B at 85 (Cooper Dep.), ECF No. 64-4. He claims that "Defendant," presumably the Sheriff, should have known that Plaintiff had previous-ly suffered a head trauma when he was shot in the head because he advised medical staff of this fact. Cooper Dep. at 34. The evidence Plaintiff cites to, however, is his

---

[3] Defendants contend that Plaintiff's allegations that alleged staffing shortages were the cause of his injuries are unsupported by evidentiary proof. Def.s' Reply Mem. of Law at 5, ECF No. 66.

sworn testimony explaining that he informed medical staff at *Highland Hospital* about a 20-year-old gunshot wound to his head, and not staff at the Jail.[4]

Watts and Greene both testified that that in sometime in 2007, un-arraigned inmates were to have their medical histories taken upon screening pursuant to newly-implemented Jail procedure in the wake of Samuels' death some three months earlier. Greene Dep. at 68:8–10 ("I don't recall the exact timeframe we made sure that everybody that came in was evaluated. I don't recall the timeframe."; Watts Dep. at 67:6–7. Watts testified that at the time of completing Plaintiff's Inmate Treatment Form, she did not know what his medical history was, and that if Plaintiff's medical history was taken down, it would have been provided on a "booking sheet." Watts did not recall seeing a booking sheet for Plaintiff. Watts Dep. at 62:4–16.

Plaintiff describes the manner of his injury at the Jail as follows. Shortly after being detained at the Jail, Plaintiff was placing a phone call to his brother just outside of his holding cell when Bruce Miles punched him in the head and jaw, knocking him to the ground and causing him to hit his head on the cement floor. Cooper Decl. ¶ 3; Cooper Dep. at 19–23. Plaintiff was then escorted to the Jail's nursing office, where he received "minimal medical treatment" from Watts, who was the only nurse working in the booking area that night. Cooper Decl. ¶ 4; Cooper Dep. at 20–21; Cooper 50-H Tr. at 21; Watts Dep. at 15–16. In her forms, Watts noted that, with respect to Plaintiff's injury, "area cleaned, Tylenol given, suggested ice pack to face." Pl. Ex. Vol. 2, Ex. D.

---

[4] Plaintiff's papers are replete with incorrect citations or citations to evidence that does not support the facts asserted. The Court is not obligated to "scour the record looking for factual disputes," *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986), nor must it "scour the parties' various submissions to piece together appropriate [] arguments," *id.; see also Weinstock v. Wilk*, No. 02-CV-1326, 2004 WL 367618, * 2 (D. Conn. Feb. 25, 2004).

Plaintiff testified that Watts advised him that he had suffered a broken jaw and needed to go to the hospital, but was told by Watts that they were "too busy" and did not have a transporter available. Cooper Decl. ¶ 5; Cooper 50-H Tr. at 21, 47. According to Plaintiff, he begged Watts and a sergeant on duty to take him to the hospital, but his request was denied. Cooper Decl. ¶ 7; Cooper Dep. at 26, 28. Plaintiff was then returned to his holding cell and remained there without further medical treatment in severe pain for over 18 hours. Cooper Decl. ¶ 8; Cooper Dep. at 47–48. While in his cell, Plaintiff claims to have suffered a grand mal seizure. Cooper Decl. ¶ 9; Cooper 50-H Tr. at 42. Watts recalled that she discussed Plaintiff with another booking nurse at the Jail. Watts did not recall whether the other booking nurse "remembered [Plaintiff] before 2007 or was it after, if he was an inmate after 2007, but I remember she telling me that he had seizures and sometimes he would refuse stuff like that, being sent to the hospital and stuff like that, but we talked about him a tiny bit at lunch." Watts Dep. 47:25–48:5.

Plaintiff was released from the Jail after the charges against him were dismissed. He then walked approximately five miles to Highland Hospital in Rochester, New York, for treatment. Cooper Decl. ¶¶ 11-12; Cooper 50-H Tr. at 24. He was immediately scheduled for surgery at nearby Strong Memorial Hospital. Cooper Decl. ¶ 13.

In his amended complaint, Plaintiff claims that as a result of his injuries at the Jail and Nurse Watts' failure to render proper medical treatment while he was detained, he suffered the following ailments: a broken jaw requiring insertion of a metal rod, severe swelling of the brain, seizure, short term memory loss, traumatic brain injury, encephalitis, and paranoid schizophrenia. He further alleges that these serious medical conditions

were caused by the Jail's customs or practices and by the Sheriff's failure to properly train and supervise his subordinates. Am. Compl. ¶¶ 26-43; Cooper Decl. ¶ 14; Cooper Dep. at 29, 33-35, 37, 41; Cooper 50-H Tr. at 13.

## STANDARDS OF LAW

### *Summary Judgment Standard*

A party is entitled to summary judgment "if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In order to establish a material issue of fact, the non-movant need only provide "sufficient evidence supporting the claimed factual dispute" such that a "jury or judge [is required] to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89 (1968)). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S., 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments).

## 42 U.S.C. § 1983

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d. Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875–76 (2d Cir. 1994)).

### Deliberate Indifference to Serious Medical Needs

Because Plaintiff was a pretrial detainee, his claims arise under the Fourteenth Amendment to the United States Constitution. *See Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (analyzing pretrial detainee's claim of deliberate indifference under the Fourteenth Amendment). "A custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official (1) denied treatment needed to remedy a serious medical condition and (2) did so because of his deliberate indifference to that need." *Universal Calvary Church v. City of N.Y.*, No. 96 CIV. 4606, 2000 WL 1538019 at *8 (S.D.N.Y. Oct. 17, 2000) (citing *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) and *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)).

The standard for deliberate indifference is comprised of two elements: "[t]he objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir. 2003).[5] "An official acts with the requisite deliberate indifference when that offi-

---

[5] "Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irre-

cial knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law." *Id.* (citations and quotations omitted). Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id.* (citation omitted).

**ANALYSIS**

Plaintiff argues that Nurse Watts exhibited deliberate indifference to his serious medical needs when she failed to diagnose and properly treat his fractured jaw and related head injury after an altercation with another inmate at the Jail. He claims that as a result of Watts' inadequate treatment and subsequent lack of treatment for a period of 18 hours, he suffered a grand mal seizure, and currently has multiple ailments stemming from his strike to the head, including swelling of the brain and permanent brain damage. Am. Compl. ¶¶ 17-24. Defendants argue that Plaintiff fails to establish that Watts' conduct rises to a level of a constitutional violation. Def. Mem. at 8-14.

It is difficult to ascertain from the record the extent and nature of Plaintiff's injuries.[6] However, the Court assumes that some or all of his ailments constitute serious

---

spective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

[6] Plaintiff's testimony at his deposition and 50-H hearing is contradictory, rambling, and is at times indecipherable. It is difficult to tell whether Plaintiff's multiple ailments pre-dated the strike to his head, occurred because of it, or flowed from the lack of treatment he received for it. The lack of documentation substantiating Plaintiff's medical claims is equally problematic. However because Defendants have essentially ignored the objective component of the deliberate

medical needs for purposes of this motion, as Defendants have not disputed the objective component of Plaintiff's deliberate indifference claim. Def. Mem. at 14 ("As plaintiff has failed to demonstrate that a violation of plaintiff s rights were willful and deliberate, there is no need to address the objective component.").

Based on the conflicting testimony, the Court determines that a material issue of fact, as to whether Watts knew the extent of Plaintiff's injury and willfully ignored it, precludes summary judgment here. *See, e.g., Houston v. Wright*, No. 10-CV-1009, 2013 WL 5439826, at *11 (N.D.N.Y. Sept. 27, 2013) (Denying summary judgment on deliberate indifference claim where issue of fact existed as to whether plaintiff told defendant doctor about a cell infestation of cockroaches, noting that "[s]uch he-said, she-said, arguments cannot be determined on summary judgment because they require the type of credibility assessment that has been specifically reserved to the trier of fact."); *see generally Romag Fasteners, Inc. v. Fossil, Inc.,* Civil Action No. 10-01827-WGY, 2013 WL 5782522 (D. Conn. Oct. 24, 2013) ("Where the credibility of witnesses is determinative to the resolution of an issue as to a material fact, summary judgment is not appropriate.") (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

It is unclear when, after Samuel's death, the Jail's new policy of reviewing a detainee's medical history at the time of booking came into effect. Watts testified she was not aware of Plaintiff's medical history, and Plaintiff testified that he was not asked for

---

indifference claim—whether Plaintiff suffered a serious medical condition—Plaintiff's sworn testimony is sufficient to raise a triable issue of fact. The Court reminds Defendants that Plaintiff's burden on summary judgment is not to prove his claim, but to "come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir. 1997).

his medical history. Watts Dep. at 62–63, 67. Plaintiff therefore raises an issue of fact as to whether Watts should have determined whether he had a preexisting seizure disorder and if her failure to further inquire or evaluate Plaintiff's injury and strike to the head allows a fact finder to reasonably infer that Watts knew that providing minimal care for a head injury created a serious risk of harm. *See, e.g., Perdue v. Dreyer*, 03-CV-0770, 2008 WL 4826260, at *5 (W.D.N.Y. Nov. 5, 2008) (denying defendants' motion for summary judgment with regard to plaintiff's deliberate indifference claim arising out of defendants' failure to provide plaintiff with a bottom bunk because questions of fact existed as to whether defendant corrections officers were on notice of his seizure disorder). Further, taking Plaintiff's rendition of the facts as true, Watts knew Plaintiff's jaw was fractured and yet refused to provide him with transport to a hospital.

Defendants cite to *Frank v. County of Ontario*, 884 F.Supp.2d 11 (W.D.N.Y. 2012) for the proposition that a prisoner's complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. While this is a correct statement of the law, it is not applicable here, as the evidence on this record supports more than just a garden-variety negligence claim arising out of an incorrect diagnosis. *Frank* is clearly distinguishable on the facts. Frank "was *repeatedly examined* during his relatively brief stay at the Jail, and defendants *ordered tests* on more than one occasion, which generally yielded normal results that did not indicate the need for surgery or more aggressive treatment.". *Frank*, 884 F. Supp. 2d at 18–19 (emphasis added).

Since Plaintiff has presented evidence establishing a material issue of fact with respect to both the objective and subjective requirements for a claim of deliberate indifference to a serious medical need, the Court now addresses whether Plaintiff can pursue that claim under theories of municipal and supervisory liability.[7]

**Claim against Monroe County**

Plaintiff alleges that the County of Monroe maintained customs or practices that posed a substantial risk of serious harm to pretrial detainees. Specifically, Plaintiff alleges that the Sheriff knew that CMS routinely failed to provide pretrial detainees with appropriate, timely, and necessary medical care, and the Sheriff failed to adequately investigate discover, and remedy these practices. Finally, Plaintiff alleges that these customs or practices were the legal cause of Plaintiff's injuries and that, the Sheriff, acting in accord with these customs or policies, acted with deliberate indifference to Plaintiff's medical needs. Am. Compl. ¶¶ 26-30.

Defendants contend that the record is silent as to a particular policy or custom of the County of Monroe with regard to the assessment and treatment of Plaintiff's medical condition that deprived Plaintiff of a constitutionally protected right. Def. Mem., ECF No. 58-1, at 6. Plaintiff counters that he has provided evidence that the Sheriff acquiesced in and permitted the nursing shortages and inferior medical care to continue. Pl. Mem., ECF No. 64, at 7-9. That portion of Plaintiff's memorandum relies on 48 pages of the pretrial deposition testimony of Daniel Greene, from page 22 through page 60. Pl.'s Mem. of Law at 8. Greene's testimony established the following: that policy decisions went through him to the Sheriff; that the staff held frequent meetings; that complaints

---

[7] As stated earlier, Nurse Watts and CMS, the medical services provider, are no longer parties to this action.

about medical care in the jail went to the jail superintendent and, "[b]ased on the nature of the seriousness of the allegation it may go to a higher level person," Greene Dep. 30:2–4; that the Sheriff approved jail policies, *id.* 32:3–5; that Greene met with the Sheriff on or about May 5, 2007, to discuss "shortages [of nursing staff] and situations regarding the Samuels case," *id.* 43:2–5; that Greene did not recall whether he ever saw the state commission report on Samuels' death, *id.* 46:6–8; that Greene was unaware of the incident involving Plaintiff until his then-employer, Plaintiff's former counsel, Christina A. Agola, informed him of it, *id.* 48:9–16; that Gary Caiola replaced Greene as undersheriff in 2007, *id.* 50:9–13; that the jail experienced shortages of nurses, *id.* 55:3–5; that Greene met with "senior people" from CMS in 2006 and 2007, *id.* 57:13–16; that, "[t]he sheriff's office constantly complained to CMS," *id.* 58:6–7; and that one of the doctors employed by CMS's predecessor, PHS (and, evidently CMS), Dr. Kahni, complained to Greene about nursing staff shortages from 2002 until 2006, *id.* 60:2–61:10. Additionally, Watts testified that sometime in 2007, the booking procedures at the jail changed by requiring that the nurse in booking review the booking sheets of all unarraigned inmates for any notations about medical issues. Watts Dep. 27:18–28:23.

The general legal principles concerning municipal liability are well settled:

> Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee.

*Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citations omitted).

Although it is a difficult standard, a municipality's failure to act may constitute an official policy. *See Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980) ("[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts. Although that standard is undoubtedly difficult to meet, we cannot say as a matter of law that failure to act may never give rise to an official policy within the meaning of *Monell*.") (citations and footnote omitted). "An even stronger case for imposing liability for inaction occurs when the municipality fails to remedy a specific situation, the continuation of which causes a deprivation of constitutional rights." *Id.*, 619 F.2d 201 at n. 5. However, a municipal policy cannot be inferred from a single incident involving an employee below the policymaking level. *Davis v. Cnty. of Nassau*, 335 F.Supp.2d 668, 678 (E.D.N.Y. 2005). Finally, the municipality's execution of a policy or custom must have inflicted the injury in question. *Graham v. Cnty. of Erie*, No. 11–CV–605, 2012 WL 1980609, at *3 (W.D.N.Y. May 31, 2012) (citing *Monell*, *supra*).

The evidence submitted demonstrates that at least Undersheriff Greene knew about the issues with CMS' staffing and addressed it multiple times during internal meetings. While Defendants urge that the problems with CMS were being addressed in the form of creating Requests for Proposals to replace CMS as the Jail's medical services provider, *see* Greene Dep. at 52-61, the evidence submitted also indicates that Monroe County agreed to extend its term of contract with CMS through March 31, 2008, some seven months after Samuels' death and five months after Plaintiff's incident at the

Jail. Def. Ex. L (Amendatory Agreement No. 4 with CMS extended CMS's contract through 2008), Feb. 28, 2013, ECF No. 58-15. While staff shortages are frequently mentioned, the injury to Plaintiff did not result from a staff shortage. Essentially, Plaintiff is complaining that his medical history was not taken upon his arrest, that Nurse Watts gave him only minimal treatment and refused to provide him with transport to a hospital, and despite her assertion to the contrary, indicated that Plaintiff had a broken jaw.

In addition to the issue of fact concerning Plaintiff's broken jaw, the Court also finds an issue of fact as to whether the custom of a diminished level of medical care provided by CMS caused Plaintiff's injuries. While the record is unclear as to what injuries Plaintiff actually sustained and was treated for, Defendants offer no facts or evidence to counter Plaintiff's own sworn assertions that he suffered a multitude of medical conditions as a result of being struck in the jaw, hitting his head on the ground, and subsequently receiving inadequate medical treatment from the Jail's medical staff. Resolving all ambiguities in Plaintiff's favor, the Court finds that the County of Monroe is not entitled to summary judgment, and its motion is denied with regard to Plaintiff's municipal liability claim.

### Claims against the Sheriff in his Individual Capacity

Also in his amended complaint, Plaintiff alleges that the Sheriff is individually liable for failure to train and supervise.[8] Am. Compl. ¶¶ 31-43. Defendants argue that

---

[8] The Court notes that "failure to train claims are usually maintained against municipalities, not against individuals." *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001). The Court therefore construes Plaintiff's supervisory claim under a failure to supervise theory of liability.

Plaintiff's claim fails because he has not established personal involvement on behalf of the Sheriff. Def. Mem. at 14-15. The Court agrees.

Greene testified at his pretrial deposition that he was not aware of Plaintiff's injury when he was Undersheriff of Monroe County, and only became aware of it when Christiana A. Agola, who employed him as a private investigator,[9] brought the matter to his attention. Greene Dep. 48:9–16. He also stated that CMS staff were directly supervised by the jail superintendent and not himself. *Id.* 64:21–25. Greene further stated that typically when he met with the medical care provider for the jail, CMS, the jail superintendent would be present, as would a regional vice president from CMS, and, "I believe at times the sheriff." *Id.* 68:21–69:3; 72:3–13. Frequently they discussed shortages of nursing staff. *Id.* 69:6–12; 72:20–23. Additionally, he stated that the jail superintendent met separately with CMS on many occasions, to bring complaints to CMS's attention. Greene Dep. 74:2–7.

It is well-settled that supervisory liability cannot rest on *respondeat superior* or "proof of linkage in the prison chain of command." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Thus, Plaintiff must plead and prove that the Sheriff was personally involved in a constitutional violation. Personal involvement requires that: (1) the defendant participated directly in the constitutional violation; (2) the defendant was informed of the violation, but failed to remedy the wrong; (3) the defendant created or permitted a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed unconstitutional acts; and/or (5) the defendant exhibited deliberate indifference to the rights of inmates by fail-

[9] Greene opened his own investigation firm, Leader Security Services, after leaving the Monroe County Sheriff's Office. Greene Dep. 6:6–9.

ing to act on evidence that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995);[10] *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

To support a finding of personal involvement based on a failure to supervise, the fourth *Colon* factor, Plaintiff must show that the Sheriff "knew or should have known that there was a high degree of risk that [subordinates] would behave inappropriately . . . but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk[.]" *Poe v. Leonard*, 282 F.3d 123, 142 (2d Cir. 2002). Further, he must prove causation; "that is, that the [defendant's] 'inadequate supervision actually caused or was the moving force behind the alleged violations.'" *Stevens v. City of Bridgeport*, 607 F.Supp.2d 342, 356 (D. Conn. 2009) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007)).

As stated above, the Court understands that CMS received frequent complaints from the jail staff about shortages of nurses. However, a nursing shortage is not the cause of Plaintiff's injuries here. It is also undisputed that Watts failed to review Plaintiff's medical history prior to treating him for a facial injury and head strike and that Jail policies were changed at some time to require a medical history review of all detainees—specifically in response to an inmate's death some two months earlier. No evidentiary proof submitted shows that the Sheriff was responsible for supervision of the day-to-day operations of the medical staff at the jail.

---

[10] The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

Because Plaintiff has failed to raise an issue of fact as to whether the Sheriff was personally involved in the alleged constitutional deprivation, the Sheriff is entitled to summary judgment on Plaintiff's deliberate indifference claim against him.

## CONCLUSION

Defendants' motion is granted in part, and denied in part. Defendants' motion for summary judgment, ECF No. 58, is denied with respect to the County of Monroe. However, Sheriff Patrick O'Flynn has shown his entitlement to summary judgment on the claims against him individually, and thus, is entitled to summary judgment. The Clerk is directed to enter judgment for defendant Patrick O'Flynn.

Discovery is complete in this case, therefore, the Court will schedule a status conference to discuss Plaintiff's representation[11] and set a date for a jury trial.

Dated:  December 3, 2013
          Rochester, New York                              /s/ Charles J. Siragusa
                                                           CHARLES J. SIRAGUSA
                                                           United States District Judge

---

[11] As stated above, Plaintiff's counsel, Christina A. Agola, was suspended from the practice of law on September 10, 2013. The Court was informed by a paralegal at Ms. Agola's firm that her associate, Ryan Charles Woodworth, Esq., resigned, and is also aware that Plaintiff has actively sought new counsel.